# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CASE NO: 1:15-CV-371

DAVID LAKOWITZ, Individually and On Behalf of All Others Similarly Situated,

        Plaintiff,

v.

DOUGLAS H. BOWERS, SUSAN G. CASEY, PAUL R. BURKE, NORMAN P. CREIGHTON, WILLIAM F. GRANT III, DANIEL R. MATHIS, ROBERT S. MUEHLENBECK, JOHN T. PIETRZAK, SETH RUDNICK, ROBERT H. SCOTT, W. KIRK WYCOFF, ROBERT I. USDAN, SQUARE 1 FINANCIAL, INC., and PACWEST BANCORP,

        Defendants.

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND INDIVIDUALLY FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

JURY TRIAL DEMANDED

Plaintiff David Lakowitz ("Plaintiff"), on behalf of himself and all others similarly situated, by and through the undersigned counsel, alleges the following upon information and belief, including the investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of Square 1 Financial, Inc. ("Square 1" or the "Company") against the Company's Board of Directors (the "Board" or the "Individual Defendants") for breaches of fiduciary duties owed to Company stockholders, and against Square 1 and PacWest Bancorp ("PacWest") for aiding and abetting such breaches by the Company's officers and directors. Plaintiff also brings claims in his individual capacity against

Square 1 and the Individual Defendants for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     On March 2, 2015, the Company announced it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with PacWest, pursuant to which the Company will be merged with and into PacWest, with only PacWest surviving the transaction, in a deal worth approximately $849 million.   Pursuant to the Merger Agreement, each outstanding share of Square 1 common stock will be converted into the right to receive 0.5997 of a share of PacWest common stock (the "Merger Consideration").    Notably, the Merger Consideration is not protected by a collar that would limit the downside risk of a fall in PacWest stock price – something that has happened since the announcement of the Proposed Transaction.

3.     As described more fully herein, the Merger Consideration fails to adequately compensate Square 1 stockholders for their stake in the Company, despite its strategic positioning as a leader in an expanding marketplace.   As *American Banker* journalist Jeffrey Marsico observed in a March 16, 2015 article, "Square 1 Financial's decision to turn over its keys to PacWest Bancorp in Los Angeles left me scratching my head at first. Given Square 1's promising earnings trajectory, why would one of the most successful startup banks in a generation decide to sell?"   In particular, the Company has seen significant growth over the past year, and the Merger Consideration woefully undercuts these gains. During the 2014 year alone, Square 1's average loan balance rose nearly 29 percent and its net income during the same time period rose 54 percent to $34.1 million.    Furthermore, during the first year in which the Company went public, shares of the Company rose 54 percent.

4.     According to the Form 10-k Annual Report filed with the United States Securities and Exchange Commission (the "SEC") for the year ended December 31, 2014, net income in

2

2014 was $34.1 million, as compared to $22.1 million for the year ended December 31, 2013 and $14.1 million for the year ended December 31, 2012. Thus given Square 1's strong financial performance, position in the market, poise for growth, asset value, and strong balance sheet, the consideration to be received by the Company's stockholders is insufficient and undervalues the Company.

5. The Proposed Transaction is also the product of a flawed process that was designed to ensure the sale of Square 1 to PacWest on terms preferential to the defendants and other Square 1 insiders and which subvert the interests of Plaintiff and the other public stockholders of the Company. For example, as part of the Proposed Transaction, the PacWest Board of Directors will be increased by one, which will be filled by a current director of the Company.

6. Exacerbating matters, defendants have agreed to lock up the Proposed Transaction with certain deal protection devices which preclude other bidders from making successful competing offers for the Company. Under the terms of the Merger Agreement, there are a slew of provisions that unreasonably inhibit potential third party bidders from launching topping bids, including: (i) a strict no-solicitation provision that severely constrains the Individual Defendants' ability to communicate and negotiate with potential buyers who wish to submit or who have submitted unsolicited alternative proposals; (ii) a "last look" provision that allows PacWest five business days to re-negotiate with the Board after it is provided with written notices of any unsolicited third-party bid that may be presented to the Board; and (iii) a termination fee provision whereby the Board agreed to pay PacWest $32.5 million in the event that the Company receives a higher offer to acquire Square 1 and terminates the Merger Agreement.

7.    These unreasonable terms, taken together, foreclose on the possibility that a bidder will assume the significant time and expense required in order to engage in the sales process at this late stage.  In addition, the deal protection provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Square 1.

8.    In further breach of their fiduciary duties, on April 22, 2015, the defendants caused to be filed a Form S-4 Registration Statement (the "Registration Statement") with the SEC in an effort to solicit stockholder support in favor of the Proposed Transaction.  The Registration Statement is materially deficient and deprives Square 1's stockholders of the basic information they require to make an intelligent, informed and rational decision to vote for or against the Proposed Transaction.  As detailed below, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process for the Company; (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by the Company's financial advisor, Sandler O'Neill & Partners, L.P. ("Sandler O"Neill"); and (c) the Company's financial projections.

9.    In endeavoring to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches.  Moreover, the deal protection devices operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Square 1.  In pursuing the unlawful plan to sell Square 1 at a wholly insufficient price, pursuant to a defective sales "process," and via a wholly deficient Registration Statement, defendants have breached—and continue to breach—their fiduciary duties of loyalty and due care, and/or have aided and abetted therein.

4

10.     Plaintiff seeks only equitable relief to enjoin defendants from taking any steps to consummate the Proposed Transaction without first curing their breaches of fiduciary duty, violations of federal securities law, and/or aiding and abetting of such breaches of fiduciary duty. Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa ) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act. The Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367, over Plaintiff' state-law claims. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because: (i) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, therefore, this action is brought as a class action with respect to Counts I and II; (ii) a member of the Class of Plaintiffs is a citizen of a State different from a defendant; and (iii) less than two-thirds of the members of the proposed Class are citizens of North Carolina.

13.     Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Square 1 is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff is and has been at all material times, a public stockholder of Square 1. Plaintiff is a resident of the state of New York.

16.     Defendant Square 1 is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 406 Blackwell Street, Suite 240, Durham, NC 27701.  Square 1 common stock trades on the Nasdaq stock exchange under the ticker symbol "SQBK".

17.     Defendant Douglas H. Bowers ("Bowers") is Chairman, President and Chief Executive Officer of Square 1.  He has been a member of the Board since 2011.  Upon information and belief, Bowers is a resident of North Carolina.

18.     Defendant Paul R. Burke ("Burke") has been a member of the Board since 2010. Upon information and belief, Burke is a resident of New York.

19.     Defendant Susan G. Casey ("Casey") is an original founder Square 1 and has been a member of the Board since 2007.  Upon information and belief, Casey is a resident of North Carolina

20.     Defendant Norman P. Creighton ("Creighton") has been a member of the Board since 2005.  Upon information and belief, Creighton is a resident of California.

21.     Defendant William F. Grant III ("Grant") has been a member of the Board since 2005.  Upon information and belief, Grant is a resident of Virginia.

22.     Defendant Daniel R. Mathis ("Mathis") has been a member of the Board since 2004.  Upon information and belief, Mathis is a resident of California.

23.     Defendant Robert S. Muehlenbeck ("Muehlenbeck") is a chairman of the Square 1 Board and has been a member of the Board 2005.  Upon information and belief, Muehlenbeck is a resident of California.

24.     Defendant John T. Pietrzak ("Pietrzak") has been a member of the Board since 2010.  Upon information and belief, Pietrzak is a resident of Texas.

25.     Defendant Seth Rudnick ("Rudnick") has been a member of the Board since 2009.  Upon information and belief, Rudnick is a resident of New York.

26.     Defendant Robert H. Scott ("Scott") has been a member of the Board since 2009.  Upon information and belief, Scott is a resident of California.

27.     Robert I. Usdan ("Usdan") has been a member of the Board since 2013.  Upon information and belief, Usdan is a resident of New York.

28.     W. Kirk Wycoff ("Wycoff") has been a member of the Board since 2010.  Upon information and belief, Wycoff is a resident of Pennsylvania.

29.     Defendants referenced in ¶¶ 17-28 are collectively referred to herein as the "Individual Defendants."  By virtue of their positions as directors and/or officers of Square 1, the Individual Defendants are in a fiduciary relationship with Plaintiff and the other public stockholders of Square 1.

30.     Each of the Individual Defendants at all relevant times had the power to control and direct Square 1 to engage in the misconduct alleged herein.  The Individual Defendants' fiduciary obligations required them to act in the best interest of Plaintiff and all Square 1 stockholders.

31.     Each of the Individual Defendants owes fiduciary duties of loyalty, good faith, due care, and full and fair disclosure to Plaintiff and the other members of the Class.  The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to Plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

33.     Defendant PacWest is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal executive offices at 10250 Constellation Boulevard, Suite 1640, Los Angeles, California 90067.  PacWest's principal business is to serve as the holding company for its wholly owned banking subsidiary, Pacific Western Bank, a full-service commercial bank offering a range of banking products and services.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff bring Counts I and II as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Square 1 (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

35.     This action is properly maintainable as a class action.

36.     The Class is so numerous that joinder of all members is impracticable.  As of February 27, 2015, there were approximately 29.57 million shares of Square 1 common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

37.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants have breached their fiduciary duties owed to Plaintiff and the Class and/or aided and abetted such breaches; (ii) whether defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Registration Statement; and (iii) whether defendants will irreparably harm Plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

38.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

39.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

40. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and Its Recent Strong Financial Performance*

41. Square 1, incorporated in 2004 in the state of Delaware, operates as the holding company for Square 1 Bank which provides a range of banking and financial products and services to the entrepreneurial community, and venture capital and private equity firms in the United States. The Company's deposit products include checking, money market and certificates of deposit. It also offers commercial lending products, including commercial loans, revolving lines of credit, equipment loans, asset-based loans, credit cards, and capital call loans; and real estate secured, government-guaranteed, and construction loans. In addition, the Company provides investment products, foreign exchange, bill pay, wires, ACH, letters of credit, and lockbox services; investment advisory and asset management services; and funds management services.

42. Square 1 operates throughout the country and serves its customers from ten locations throughout the country, with key offices in New York City, Chicago, Los Angeles, and Seattle. As of December 31, 2014, the Company had total assets of $3.1 billion.

43. The past few years for the Company have seen extraordinary growth, and there is no reason to think that should slow down. For example, at the close of the fiscal year 2012, Square 1 had total assets of $1.8 billion; by the same time in 2013, total assets had increased to $2.3 billion, and by the close of fiscal year 2014, total assets had increased to $3.1 billion.

Revenue during 2014 had increased to $116.38 million, while quarterly year-on-year revenue growth was 25.8% and total year-on-year earnings growth was 37.3%.

44.     Since the Company went public on March 27, 2014, less than one year prior to the announcement of the Proposed Transaction, there has been significant growth in its per share price.  In the four months prior to the announcement of the merger, there had been a 39.88% increase in the per share price, from a low on October 16, 2014 at $16.92, to a high of $28.75 on February 26, 2015, just before the announcement of the Proposed Transaction. Furthermore, for the previous twelve month period, the Company reported a $4.25 revenue per share and a diluted earnings per share of $1.18. The Company was and still is poised for significant growth. Defendant Bowers, speaking about the 2014 year-end fiscal results stated: "We are very pleased with 2014 results. Overall loan and deposit growth were strong in the fourth quarter and the full year. We are pleased with credit quality, and are well positioned to continue our momentum into 2015."

45.     Echoing the words of Bowers, financial commentator Dallas Salazar wrote as recently as February 3, 2015:

> Square 1 exampled itself as a rare financial institution that was able to grow NIM let alone doing this while reducing net charge-offs to average outstanding loans from 0.95 to 0.68, reducing nonperforming loans as a percent of total loans from 1.34 to 1.28, and reducing nonperforming assets as a percent of total assets from 0.63 to 0.56 - all illustrating that Square 1's full year excellence wasn't the result of increased risk. On the contrary, results have shown to be grown in a reduced risk environment….I continue to recommend a long position in Square 1 as the name has shown no signs of fundamental regression and has been a very solid performer since initiating coverage, now up 36.2%.

46.     Additionally, according to the Zacks Investment Research firm, "analysts are forecasting earnings increase[s] of 5.93% over last year…[and] earnings growth next year of 16% over this year's forecasted earnings."

*The Flawed Process Leading to the Proposed Transaction*

47.     As evidenced in the Registration Statement, the Board failed to even attempt to maximize stockholder value prior to executing the Merger Agreement. The Board only negotiated with a single bidder, failing to contact any other potentially interested party or even attempting to engage in any semblance of a sales process for the benefit of Plaintiff and other public stockholders of Square 1.

48.     According to the Registration Statement, in November 2014, Matthew Wagner ("Wagner"), PacWest's CEO, contacted an unidentified member of the Board to express PacWest's interest in exploring strategic "matters" with the Company.  On November 14, 2014, defendant Bowers held a telephone call with Wagner, wherein Wagner expressed his interest in a potential strategic business combination with Square 1.  In particular, Wagner expressed an interest in continuing conversations regarding a potential transaction and commencing due diligence.  The Registration Statement does not disclose Bowers' response to Wagner's verbal indications of interest.

49.     A week after the telephone call between Bowers and Wagner, a special meeting of the Board took place on November 20, 2014.  At this meeting, Bowers finally disclosed his prior conversation with Wagner to the Board.  Interestingly, despite having purportedly only just learned of PacWest's interest, the Registration Statement states that the Board then reviewed a preliminary financial analysis of the potential combination of the two companies, which had been developed internally by the Board and management in preparation for the special meeting.

50.     At the November 20, 2014 meeting, the Board also established a mergers and acquisitions committee (the "M&A Committee") comprised of Defendants Bowers, Muehlenbeck, Usdan, Burke and Wycoff.  The Registration Statement does not disclose what

12

prompted the Board to appoint the four directors with the largest holdings of voting power, at that time holding in the aggregate more than 26% of the outstanding voting power of Square 1, although it innocuously states that the Board "noted" that each director was a significant stockholder. Given the M&A Committee's significant voting power, it's likely the remaining Board would be forced to accept its recommendation regardless of the best interests of the Company and its stockholders, and the Registration Statement intimates that the Board acknowledged as much.

51.     At some point between the initial phone call and the November 20, 2014 meeting, defendant Pietrzak, a member of the Board and managing principal at Castle Creek Capital, a significant stockholder of Square 1, recused himself from all discussions pertaining to PacWest. Specifically, Pietrzak recused himself because the founder and managing principal of Castle Creek Capital, John Eggemeyer, was the Chairman of the PacWest board of directors. The Registration Statement does not disclose whether Pietrzak recused himself before the Board created the preliminary financial analysis to be reviewed at the November 20, 2014 meeting.

52.     Despite having created the M&A Committee to explore PacWest's interest, on December 4, 2014, Bowers and Wagner again spoke privately regarding a potential transaction at an industry conference. There, the two company CEO's discussed their respective companies and the feasibility of a strategic business combination. The Registration Statement does not disclose whether price was discussed during this private meeting. A few days later, on December 8, 2014, the M&A Committee arranged a meeting with representatives of PacWest to discuss a potential transaction in more detail.

53.     On December 16, 2014, after a full month of various private discussions between Bowers and Wagner, the M&A Committee finally met with Wagner and senior PacWest

executives for the first time. The discussion principally focused on Square 1's lines of businesses and the complementary nature of Square 1's business to that of PacWest. According to the Registration Statement, Wagner "confirmed" PacWest's potential interest in a strategic business combination in which Square 1 stockholders would receive consideration of $27.00 per share. However, the Registration Statement does not disclose any prior conversation regarding price which would be able to be "confirmed" at this meeting. Indeed, the M&A Committee had never previously met with PacWest representatives so any confirmed price point would have to come from an undisclosed aspect of private discussions between Bowers and Wagner.

54. Two days later, on December 18, 2014, at another special meeting of the Board, the full Board reviewed the details of the discussions between representatives of Square 1 and representatives of PacWest. The Board concluded to continue discussions with PacWest and directed the M&A Committee to continue to engage with PacWest. The Registration Statement does not disclose, and therefore it is fair to assume, that the Board did not consider soliciting other potential buyers at this meeting to engage in a competitive auction against PacWest. The Board also did not consider retaining a financial advisor.

55. On December 30, 2014, Square 1 entered into a confidentiality agreement with PacWest. Thereafter, in January 2015, the M&A Committee finally recommended that the Board retain "one of two" financial advisors to assist in a review of potential strategic alternatives. The Registration Statement does not disclose the identity of the other financial advisor, in addition to Sandler O'Neill, which was up for consideration or why Sandler O'Neill was perceived as a better choice in light of its significant conflicts of interest. Nevertheless, on January 29, 2015, Square 1 formally retained Sandler O'Neill.

56.    On January 28, 2015, the Board met at a regularly scheduled meeting and largely discussed the Company's strategic and financial alternatives, in light of PacWest's verbal indications of interest to date.  In the course of its discussions, the Board also considered other potential strategic partners identified by Sandler O'Neill, the likelihood of any such partners actually having interest in proceeding with a transaction, as well as what the Board believed to be very significant risks from a confidentiality, competitive, and employee retention perspective of approaching other potential strategic partners.  Significantly, the Registration Statement never discloses: (1) the identity or number of other potential strategic partners identified by Sandler O'Neill; (2) why a deal with PacWest, despite having no definite terms at this point, was perceived a superior option to a deal with any potential strategic partner; (3) whether the Board considered soliciting interest from any potential strategic partner for the purpose of engaging in a competitive auction with PacWest, and if so, why the Board concluded such an option was undesirable; and (4) how the "very significant risks," which precluded the Board from engaging in any discussions with an alternative strategic partner, were not also present in discussions with PacWest and alternatively, why were the risks so significant that it precluded any semblance of a competitive auction.

57.    At this meeting, the Board determined to continue discussions with PacWest and to not engage any alternative party, effectively deciding to forgo any pre-signing market check in favor of a single bidder process.  Accordingly, the Board authorized management to proceed with reciprocal due diligence, begin discussing with PacWest specific deal terms, and request from PacWest a written confirmation of the significant terms on which it would be willing to proceed with a transaction.  The Registration Statement never discloses what prompted the

15

Board, or the M&A Committee, to conclude the Company would be better off engaging in a strategic transaction rather than continuing as a stand-alone entity.

58.     On February 4, 2015, PacWest submitted a preliminary letter of interest indicating it was prepared to proceed with a transaction in which Square 1 stockholders would receive consideration in the form of PacWest common stock at a fixed exchange ratio of 0.5997, with a value equal to $27.00 per share.  As the Registration Statement acknowledges, on January 30, 2015, Square 1 common stock was trading at $23.26 per share, thus representing only a 14% premium.  The letter of interest from PacWest also indicated that certain large stockholders of Square 1 would be required to enter into voting agreements in support of the transaction.  The Registration Statement does not disclose the identity of the large stockholders, specifically whether they include members of the M&A Committee or Castle Creek Capital.

59.     In response to PacWest's offer, the M&A Committee met on February 11, 2015 to review the deal terms.  The M&A Committee specifically instructed Sandler O'Neill to analyze a structure that would include a band of stock price values, or "collar," within which the exchange ratio would adjust to provide a fixed consideration value for certain PacWest price movements. The M&A Committee also directed Sandler O'Neill to seek an overall increase in the $27 per share offer.  Ultimately, the Merger Agreement does not contain any collar to insulate Square 1 stockholders from a decline in PacWest stock value, and the Registration Statement does not disclose why a collar was not included despite the interest of the M&A Committee.

60.     Reciprocal due diligence continued over the course of the ensuing several weeks until on February 19, 2015, PacWest and its legal advisor, Sullivan & Cromwell LLP, provided Square 1 with an initial draft merger agreement for the Proposed Transaction. Over the course of the following week, the parties and their respective legal advisors exchanged drafts of the merger

agreement and worked towards finalizing the terms of the transaction. The Registration Statement does not disclose any of the relevant terms included in these draft merger agreements, particularly whether (1) the draft merger agreements included the $27 per share offer as the merger consideration, despite that the Board had impliedly rejected the offer as inadequate; and (2) whether the draft merger agreements included a collar on PacWest common stock share price.

61.    On February 24, 2015, the Board met for a regularly scheduled meeting and primarily discussed the ongoing deal negotiations with PacWest. In particular, the Board discussed PacWest's insistence that certain major stockholders accounting for approximately 29% of the outstanding voting power of Square 1 common stock enter into voting and support agreements in which they would agree to vote their shares in favor of the proposed transaction, including in the event a subsequent competing offer arose, and the fact that such agreements could reduce the probability of a competing offer arising. Again, the Registration Statement does not disclose the identity of the targeted stockholders, specifically whether they include members of the M&A Committee or Castle Creek Capital. In addition, the Board acknowledged the consequences of its failure to successfully negotiate for a collar: because PacWest had confirmed a fixed exchange ratio of 0.5997, Square 1 stockholders were foreclosed from the subsequent increase in the trading price of PacWest common stock, which at that time would have resulted in a much more appropriate consideration per share of Square 1 common stock of $27.35.

62.    Rather than leverage for a collar at this point, the Board utilized the following several days to negotiate the terms of employment agreements with Square 1 executive officers.

17

63.     On March 1, 2015, the Board held a special meeting to vote on recommending the Proposed Transaction to stockholders.  There, Sandler O'Neill rendered an oral fairness opinion, which was subsequently confirmed in writing, that the Merger Consideration to be paid to the holders of Square 1 common stock in the merger was fair, from a financial point of view.  This confirmation came despite that, as the Board acknowledged, the implied consideration per share of Square 1 common stock was below the trading price for Square 1 common stock at the close of trading on the preceding trading date.  Nevertheless, the Board determined that the Merger Agreement and the Proposed Transaction were advisable and in the best interests of Square 1 and its stockholders.

64.     The same day, Square 1 and PacWest executed the Merger Agreement, and PacWest executed the voting agreements with certain stockholders of Square 1. In addition, PacWest and Square 1 also entered into employment agreements with several executive officers of Square 1, including defendant Bower.  On the morning of March 2, 2015, Square 1 and PacWest issued a joint press release announcing the execution of the merger agreement.

***The Unfair Proposed Transaction and Coercive Deal Protection Provisions***

65.     In a press release dated March 2, 2015, Square 1 announced that the Company had entered into the Merger Agreement with PacWest pursuant to which PacWest will acquire Square 1 in a transaction valued at approximately $849 million, inclusive of debt.

66.     As a result of the Proposed Transaction, the post-transaction entity would have approximately $19.8 billion in assets with 80 branches throughout California and one in North Carolina. Furthermore, as a result, the combined institution would be the sixth largest publically owned bank headquartered in California.  The transaction is intended to qualify as a tax-free reorganization for United States federal income tax purposes.

67. Given the Company's size, recent financial performance, and expectations of continued growth, the Merger Consideration is inadequate and significantly undervalues the Company. The Merger Consideration represents a -0.7% premium based on Square 1's closing price on February 27, 2015. Furthermore, Square 1 traded as high as $28.75 as recently as February 26, 2015.

68. The Proposed Transaction is thus beneficial to PacWest stockholders who will gain from the increased lending power and exploitation of Square 1's growth in the venture capital business as well as its other wide ranging banking and financial products and services, while Square 1 stockholders will receive an unfair price for their shares.

69. In light of the significant advantages that PacWest will receive for completing the Proposed Transaction, the Square 1 Board failed to secure a fair price for the Company.

70. To the detriment of Plaintiff and Square 1's public stockholders, the Merger Agreement also includes terms that serve to make the Proposed Transaction a *fait accompli* and prevent other Companies from emerging with a competing offer for the Company.

71. Indeed, despite the fact that they failed to conduct any market check prior to signing the Merger Agreement, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal.

72. For example, Section 5.04 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by PacWest. The Company is also precluded by this section from providing any entity besides PacWest access to non-public information that may encourage a competitive alternative proposal.

73.     Pursuant to this section of the Merger Agreement, should a bidder submit a "*bona fide*, written and unsolicited" competing proposal, the Company must notify PacWest of the bidder's identity and the terms of the bidder's offer with 24 hours.

74.     Further, if the Board decides that the alternative proposal is a bona fide, superior proposal, the Board may not change its recommendation to stockholders regarding the Proposed Transaction without granting PacWest five business days during which the Company is contractually obligated to negotiate with PacWest in good faith and permit PacWest to amend the terms of the Merger Agreement. In order words, the Merger Agreement gives PacWest access to any rival bidder's confidential information and allows PacWest to easily make a superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse in light of the potential risks associated with disseminating a rival bidder confidential information and the ability of PacWest to easily piggy-back upon the due diligence of the foreclosed second bidder.

75.     The Proposed Transaction also includes a termination fee to be paid by the Company to PacWest in the amount of $32.5 million in the event that the Board accepts and alternative, superior proposal. Effectively, this fee requires that a competing bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer.

76.     Ultimately, these deal protection provisions unreasonably restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

77.     These deal protection devices are particularly egregious considering the Square 1 Board did not reach out to a single bidder other than PacWest and failed to conduct any semblance of an auction process in order to reasonably inform itself of Square 1's actual market value.  After failing to conduct any market check, defendants wrongfully bound the Company to a Merger Agreement that failed to include a "go-shop" provision.

*Square 1's Conflicted Financial Advisor*

78.     In preparation for the Proposed Transaction, Square 1 retained the investment bank of Sandler O'Neill to act as a financial advisor.  Unfortunately, Sandler O'Neill has substantial history with PacWest and is therefore impermissibly conflicted.

79.     Specifically, Sandler O'Neill provided PacWest with a fairness opinion in late 2012 concerning a $231 million merger between PacWest and First Financial Group, Inc. In a completely separate deal, Sandler O'Neill advised PacWest on a $145 million deposit and sale of 10 branches of Pacific West Bank, a wholly owned subsidiary of PacWest to Irvine, California based Opus Bank.

80.     Because of Sandler O'Neill's previous dealings with PacWest, the retention of Sandler O'Neill as the financial advisor for Square 1 invites the perception that Sandler O'Neill may have been interested in the deal and advised Square 1 with less than the best intentions. Because Sandler O'Neill undoubtedly is interested in retaining business with PacWest in the future, it benefits them to help PacWest in such a way as to recommend a less than fair market price for Square 1.

*The Materially Incomplete and Misleading Registration Statement*

81.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction on April 22, 2015.  As discussed below and elsewhere herein, the

Registration Statement omits material information that must be disclosed to Square 1's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

82. Notably, the Registration Statement fails to disclose to disclose the projected financial information prepared by Square 1 management and relied upon by Sandler O'Neill in its financial analyses supporting its fairness opinion. Specifically, with respect to the financial projections provided for years 2015 to 2018, the following figures should be disclosed: (i) book value of the Company; (ii) tangible book value of the Company; (iii) return on average assets; (iv) return on average equity; (v) the tier 1 leverage ratio; (vi) the total risk-based capital ratio; (vii) the net interest margin projection; (viii) nonperforming assets/total assets; (ix) core deposits; (x) tangible common equity/tangible assets; and (xi) dividend yield.

83. The omission of this key information related to Company management's projections renders the Registration Statement materially misleading because, without full access to Square 1's estimates of its future financial performance, stockholders cannot reliably assess the credibility of the various analyses performed by Sandler O'Neill that incorporated these projections, and thus cannot determine whether the merger is indeed fair, as defendants and their financial advisor claim.

84. The Registration Statement further omits material information with respect to the opinions and analyses of Sandler O'Neill as well as the process and events leading up the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Square 1 stockholders.

85. In particular, with respect to Sandler O'Neill's *Comparable Companies Analysis*, the Registration Statement fails to disclose: (i) the individual data points for each of the selected

companies observed by Sandler O'Neill; and (ii) whether Sandler O'Neill performed any type of benchmarking analysis for either Square 1 or PacWest in relation to the selected companies.

86. With respect to Sandler O'Neill's *Analysis of Selected Merger Transactions*, the Registration Statement fails to disclose the individual multiples or premiums used for each of the selected transactions observed by Sandler O'Neill, including: (i) Transaction Value/LTM EPS; (ii) Transaction Value/Estimated EPS; (iii) Transaction Value/Tangible Book Value of Equity Per Share ("BVPS"); (iv) Core Deposits premium; and (v) 1-Day Market premium.

87. With respect to Sandler O'Neill's *Net Present Value Analysis*, the Registration Statement fails to disclose the individual inputs and assumptions used by Sandler O'Neill for the selection of discount rates of 11.0-15.0%, particularly as Sandler O'Neill calculated a 10.98% discount rate for Square 1.

88. Finally, the Registration Statement is devoid of certain material information regarding the process leading up to the Proposed Transaction. For example, the Registration Statement fails to disclose, *inter alia*: (i) who on the Board was aware of defendant Bowers' preliminary discussions with PacWest CEO Wagner in November 2014 and participated in the creation of the preliminary financial analysis reviewed at the November 20, 2014 Board meeting; (ii) whether defendant Pietrzak was aware of the PacWest offer for the Company prior to his recusal and whether he played any role in the creation of the financial analysis shared with the Board at the November 20, 2014 Board meeting; (iii) why, despite creating an M&A Committee to explore PacWest's interest, defendant Bower continued to have one-on-one discussions with PacWest in early December 2014; (iv) when did PacWest make its initial offer of $27.00 per share that is purportedly confirmed at the December 16, 2014 meeting of the M&A Committee and Wagner and how was it derived; (v) the reasoning for waiting until January 2015 to retain a

financial advisor; (vi) how the "very significant risks," which precluded the Board from engaging in any discussions with an alternative strategic partner, were not also present in discussions with PacWest and alternatively, why were the risks so significant that it precluded any semblance of a competitive auction; (vii) the identity of the large Square 1 stockholders that PacWest indicated must enter into a voting agreement in support of the Proposed Transaction; and (vii) why the Board ultimately determined to forgo any auction for the Company or insist upon a collar to protect against the downside risk of a drop in PacWest share price

89.     Cumulatively, the information requested above is necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction.  Therefore, the aforementioned omitted information is highly relevant and material to Square 1 stockholders.

90.     For the reasons detailed herein, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

## COUNT I

**(On Behalf of Plaintiff and the Class Against the Individual Defendants
For Breach of Fiduciary Duties)**

91.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

92.     As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of Square 1's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance Square 1's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public stockholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such

24

conflicts exist, to ensure that all conflicts are resolved in the best interests of Square 1's public stockholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of Square 1; and (f) disclose all material information concerning the Proposed Transaction to the Company's stockholders.

93.     The Individual Defendants have breached their fiduciary duties to Plaintiff and the Class.

94.     As alleged herein, the Individual Defendants have initiated a process to sell Square 1 that undervalues the Company. The Individual Defendants have failed to sufficiently inform themselves of Square 1's value, or disregarded the true value of the Company. Furthermore, any alternate acquiror will be faced with engaging in discussions with a management team and Board that are committed to the Proposed Transaction.

95.     Further, the Individual Defendants have caused materially misleading and incomplete information concerning the Proposed Transaction to be disseminated to the Company's public stockholders. The Individual Defendants have an obligation to be complete and accurate in their disclosures concerning the Proposed Transaction. The Registration Statement fails to disclose material information, including financial information and information necessary to prevent the statements contained therein from being misleading. Because of the Individual Defendants' failure to provide full and fair disclosure of material information concerning the Proposed Transaction, Plaintiff and the Class will be unable to make an informed decision with respect to the Proposed Transaction, and thus are damaged thereby.

96.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, causing irreparable harm to the members of the Class.

97.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**(On Behalf of Plaintiff and the Class Against Square 1 and PacWest for Aiding and Abetting the Board's Breaches of Fiduciary Duties)**

98.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

99.     Defendants Square 1 and PacWest knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.   In connection with discussions regarding the Proposed Transaction, Square 1 provided, and PacWest obtained, sensitive non-public information concerning Square 1 and thus had unfair advantages that are enabling it to pursue the Proposed Transaction, which offers unfair and inadequate consideration to the Company's stockholders.

100.    As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining fair consideration for their Square 1 shares and deprived of their ability to make an informed decision concerning whether to vote for or against the Proposed Transaction.

101.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**(On Behalf of Plaintiff, Individually, Against Square 1 and the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder)**

102.    Plaintiff brings this Exchange Act claim on behalf of himself individually.

103. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104. Defendants have issued the Registration Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, among other things, the future value of the Company, the key inputs and assumptions of the financial analyses performed by Sandler O'Neill in support of its fairness opinion, and the background leading up to the Proposed Transaction.

105. In so doing, defendants made untrue statements of fact and omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

106. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

107. Specifically, and as detailed in ¶¶ 81-90 above, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the projected financial information prepared by Square 1 management and relied upon by Sandler O'Neill in its financial analyses supporting its fairness opinion; (ii) key inputs and assumptions underlying Sandler O'Neill's financial analyses; and (iii) certain material information regarding the process leading up to the consummation of the Merger Agreement.

27

108.    Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Sandler O'Neill reviewed and discussed its financial analyses with the Board during its March 1, 2015 meeting, and further states that the Board considered both the financial analyses provided by Sandler O'Neill as well as Sandler O'Neill's fairness opinion and the assumptions made and matters considered in connection therewith.  The Individual Defendants knew or should have known that the material information identified in ¶¶ 81-90 above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified in ¶¶ 81-90 above to be materially incomplete and misleading.

109.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT IV

**(On Behalf of Plaintiff, Individually, Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934)**

110.    Plaintiff brings this Exchange Act claim on behalf of himself individually.

111.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

112. The Individual Defendants acted as controlling persons of Square 1 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Square 1, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading.

113. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

115. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and

information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

116. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

117. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

118. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company: (i) adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's stockholders; and (ii) discloses the material information discussed above which has been omitted from the Registration Statement;

C. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Directing defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demand a trial by jury on all issues so triable.

Dated: May 6, 2015                                    Respectfully submitted,


By:   /s/ David G. Schiller
      DAVID G. SCHILLER, (NCSB # 26713)
      **SCHILLER & SCHILLER, P.L.L.C.**
      5540 Munford Road, Suite 101
      Raleigh, North Carolina 27612
      Telephone: (919) 789-4677
      Facsimile:  (919) 789-4469

      *- and -*
      SHANNON L. HOPKINS
      SEBASTIANO TORNATORE
      **LEVI & KORSINSKY LLP**
      733 Summer Street, Suite 304
      Stamford, Connecticut 06901
      Telephone: (212) 363-7500
      Facsimile:  (212) 363-7171

      *Counsel for Plaintiff*